IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GLENN A. PARNO,** | : | **Civil No. 1:16-cv-1949** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **KATHLEEN KANE, RENEE** | : | |
| **MARTIN, DAVID PEIFER, BRADEN** | : | |
| **COOK, and WILLIAM NEMETZ** | : | |
| | : | |
| **Defendants.** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

In this action pursuant to 42 U.S.C. § 1983, Plaintiff brings equal protection and procedural due process claims against Defendants arising out of former Pennsylvania Attorney General Kathleen Kane's release of damning emails found in Plaintiff's email account. Presently before the court are Defendants' motions to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Defendants' motion will be granted in part and denied in part.

# I. Background

## A. Facts[1]

Plaintiff Glenn A. Parno ("Plaintiff") is a former employee of the Pennsylvania Office of the Attorney General ("OAG"). Plaintiff worked at the OAG from July 1997 to January 2014, moving up from Deputy Attorney General to Senior Deputy Attorney General and then to Chief Deputy Attorney General in charge of the Environmental Crimes Section. (Doc. 14, ¶ 4.) At the time of the events in question, Plaintiff was employed by the Commonwealth of Pennsylvania, Office of General Counsel as a staff attorney assigned to the Department of Environmental Protection. (*Id.*) Defendant Kathleen Kane ("Kane") was elected Attorney General of Pennsylvania on November 6, 2012 and was sworn into office on January 15, 2013. (*Id.* at ¶ 14.) As part of her campaign for the Attorney General position, Kane had promised to investigate the OAG's investigation, under then-Chief Deputy Attorney General Frank Fina, into the prosecution of Jerry Sandusky, to determine if there had been any improper delay. (*Id.* at ¶¶ 12-13.) In February 2013, Kane appointed H. Geoff Moulton ("Moulton") as Special Deputy Attorney General to lead the inquiry into the Sandusky investigation. (*Id.* at ¶ 15.) During his investigation, Moulton discovered the existence of a large number of

---

[1] "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Thus, for the purposes of the motion *sub judice*, the court only considers the allegations contained in the amended complaint (Doc. 17), and will accept as true all well-pleaded factual allegations contained therein. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).

"inappropriate emails" that had been generated during the period of time covered by the Sandusky investigation and subsequently deleted from OAG servers. (*Id.* at ¶ 16.) The emails allegedly contained "obscene material, nudity, or offensive materials, such as racism or sexism," and were discovered in the email accounts of hundreds of current and former OAG employees, including Plaintiff, as well as individuals employed outside of the OAG in both the private and public sectors. (*Id.* at ¶ 16-17.)

On March 16, 2014, the Philadelphia Inquirer published an article entitled "Kane shuts down sting that snared Philadelphia officials" which reported that Kane, upon becoming Attorney General, shut down an OAG undercover sting operation spanning the previous three-year period that had captured democratic public officials in Philadelphia, including four members of the State House delegation, on audio tape accepting cash. (*Id.* at ¶ 20.) According to the amended complaint, this article enraged Kane, who blamed Fina as the leak for the story. (*Id.* at ¶ 21.) In an email to her media strategist J.J. Balabon the same day the article was published, Kane wrote "[t]his is war," allegedly targeting Fina and those closely associated with him, including Plaintiff. (*Id.* at ¶¶ 21-23.) As a means of carrying out this "war," and in retaliation against Fina for his perceived leak to the Inquirer, Kane leaked Grand Jury information about a prior investigation into J. Wyatt Mondesire, the former head of the Philadelphia NAACP, lead by Fina and

former Senior Deputy Attorney General E. Marc Costanzo ("Costanzo"), that was closed without the filing of criminal charges. (*Id*. at ¶ 24.)

Kane's retaliatory motive was evident in a series of text messages between Kane and political consultant Joshua Morrow ("Morrow") in which Kane stated that revenge was "[b]est served cold," and Morrow responded that it was "[t]ime for Frank [Fina] to feel the heat." (*Id*. at ¶ 26.) In addition to the text messages, the F.B.I. intercepted a phone conversation in which Morrow stated that Kane had become "unhinged" and was attempting to "throw everything on the wall and see what sticks." (*Id*. at ¶ 25.)

On May 8, 2014, Fina and Costanzo wrote to the Honorable William Carpenter, Supervising Judge, Thirty-Fifth Statewide Investigating Grand Jury, to notify him that they had been contacted by a reporter from the Philadelphia Daily News who was in possession of confidential Grand Jury information regarding the Mondesire investigation, and Judge Carpenter appointed Special Prosecutor Thomas Carluccio to investigate the leak. (*Id*. at ¶ 27.) On June 6, 2014, the Philadelphia Daily News published an article about the OAG's prior investigation into Mondesire that contained confidential investigative and Grand Jury information and was critical of Fina's decision not to prosecute Mondesire. (*Id*. at ¶ 28.)

Throughout the spring and summer of 2014, in furtherance of her retaliation against Fina, Kane notified various news reporters that she had discovered inappropriate emails on OAG servers and suggested that the reporters submit requests under the Right-To-Know Law for emails of Fina and Costanzo, as well as eight former OAG employees known to be friends with Fina, including Plaintiff. (*Id*. at ¶ 29.) Kane enlisted the help of Defendant Renee Martin ("Martin"), former Communications Director for the OAG, as well as others, to plant these Right-To-Know requests with reporters. (*Id*. at ¶¶ 6, 29.)

As the Special Prosecutor's investigation into Kane and her inner circle intensified, then-OAG Chief Operating Officer David Tyler ("Tyler") told Plaintiff that Kane was going to release the inappropriate emails to the press if Fina did not "back off." (*Id*. at ¶¶ 31-32.) In August 2014, Chief Deputy Attorney General James Barker told Plaintiff that, despite his advice to the contrary, Kane was going to release the inappropriate emails due to her ongoing feud with Fina. (*Id*. at ¶ 34.)

On September 11, 2014, Kane was served with a subpoena to testify before the Thirty-Fifth Statewide Investigating Grand Jury. (*Id*. at ¶ 35.) In response, on September 25, 2014, Kane directed Martin, along with former OAG Special Agents Defendants David Peifer ("Peifer"), William Nemetz ("Nemetz"), and Braden Cook ("Cook") (collectively, with Kane and Martin, "Defendants"), to summon the media to the OAG's office in Harrisburg in order to reveal

inappropriate images attached to emails that had been recovered from OAG servers during the Sandusky investigation. (*Id*. at ¶ 36.) During this reveal, Defendants verbally disclosed the names of only perceived friends of Fina, including Plaintiff, and redacted the emails to conceal the names of all other recipients. (*Id*.) On October 2, 2014, once again at Kane's direction, Martin released paper volumes of the inappropriate emails, assembled by Martin, Peifer, Cook, and Nemetz, to the media. (*Id*. at ¶ 37.) These paper volumes contained the names of Fina's friends, including Plaintiff, but redacted the identities of the hundreds of other similarly-situated individuals who had received or sent the same emails. (*Id*.)

According to the amended complaint, Kane's retaliatory actions toward Plaintiff were done in order to both circumvent a protective order issued by Supervising Judge Carpenter that prohibited Kane from retaliating directly against Fina, as well as cause Fina's friends to pressure him into shutting down the Special Prosecutor's investigation into Kane. (*Id*. at ¶ 42.) Kane released Plaintiff's emails to the public not for any legitimate employment reasons, as he was no longer an OAG employee, but, allegedly, in order to undermine Plaintiff's reputation without giving him any prior notice. (*Id*. at ¶¶ 47, 55-56.) Immediately upon, and as a direct and proximate result of the public releases, Plaintiff was terminated from his position with the Commonwealth of Pennsylvania, Office of General Counsel. (*Id*. at ¶ 132.)

On November 13, 2014, in a document entitled Attorney General Kathleen G. Kane's Emergency Application For Extraordinary Relief, Kane stated to the Pennsylvania Supreme Court that the protective order barring her from releasing Fina's emails needed to be lifted because it was preventing her from carrying out her duties as Attorney General, the chief law enforcement officer for the Commonwealth of Pennsylvania, to protect the citizens of the state from criminal activity. (*Id*. at ¶ 58.) On November 18, 2014, Kane provided a statement to the media that under the Right-To- Know Law, the pubic had the right to be informed about the "clearly pornographic" emails that had been found in the accounts of public officials. (*Id*. at ¶ 59.) The following day, Kane appeared on television on CNN and stated that the inappropriate emails were possibly illegal, and that many of them were "hardcore, sometimes graphic, sometimes violent emails that had a string of videos and pictures depicting sometimes children, old women – some of them involved violent sexual acts against women." (*Id*. at ¶ 60.) The amended complaint alleges that Kane knew these statements were false at the time and made them nonetheless out of malice and a desire to stigmatize Plaintiff's reputation. (*Id*.) Kane allegedly attempted to mischaracterize the emails as child pornography, and later in the CNN broadcast, Kane's attorney Lanny Davis stated that the images to which Kane had referred were "borderline" and "very close" to child pornography. (*Id*. at ¶ 61.)

The media attention from the CNN broadcast and the resulting local news stories, specifically one that placed Plaintiff's name on the television screen during a story entitled "Pa Attorney General: Porn email had kids," allegedly damaged Plaintiff's personal and professional reputation. (*Id.* at ¶ 62.) The day after the CNN broadcast, on November 20, 2014, Defendant Martin attempted to withdraw the characterization of the emails as containing child pornography by stating, "[w]e are not saying that it reached the level of child pornography . . . [but] I think what she said is accurate. The images are deplorable. And some contained seniors and children." (*Id.* at ¶ 63.) Kane allegedly forced Martin to retract her statement the very next day, with Martin stating that she "misspoke" and that "the Attorney General has not made a decision one way or the other in light of the recent published opinion of the Chief Justice of the Pennsylvania Supreme Court that the emails he had seen were 'clearly pornographic' and may be criminal." (*Id.* at ¶ 64.)

On December 18, 2014, the Thirty-Fifth Statewide Investigating Grand Jury recommended that Kane be charged with perjury, false swearing, abuse of office, and obstructing the administration of law or other government function arising out of her leak of confidential Grand Jury material and subsequent false testimony to the Grand Jury. (*Id.* at ¶ 66.) On August 6, 2015, after an independent investigation by the Montgomery County District Attorney's Office, Kane was so charged, and

subsequently had her law license suspended by the Pennsylvania Supreme Court. (*Id*. at ¶ 67.)

In an alleged attempt to divert attention away from her criminal prosecution, on December 1, 2015, Kane appointed former Maryland Attorney General Douglas Gansler ("Gansler") as a Special Deputy Attorney General to investigate the use of state-owned computers to send and receive inappropriate emails. (*Id*. at ¶ 68.) Despite the attempt to shift attention, Kane was convicted on all charges on August 15, 2016. (*Id*. at ¶¶ 67, 70.) The following day, Kane resigned as Attorney General, and was temporarily replaced by First Deputy Attorney General Bruce Castor ("Castor"). (*Id*. at ¶¶ 71-72.)

On August 24, 2016, Plaintiff received an email from Gansler, through his attorney, that provided notice that the OAG planned to publicly release a report regarding the misuse of the state's email system and that although Plaintiff was not mentioned in the report, his name would be listed in an appendix "as one of several hundred Pennsylvania government employees who sent fewer than 50 inappropriate emails." (*Id*. at ¶ 73.) The appendix contained a disclaimer that "many senders sent only a handful, and in some cases, only one, inappropriate email. We also acknowledge that reasonable minds may differ about the degree of offensiveness of a particular document." (*Id*.) That same day, Gansler sent an email to thirty-eight individuals who were named in the report as high-volume senders,

meaning they had sent fifty or more emails "containing sexually explicit or offensive language or pictures." (*Id*. at ¶ 74.) Plaintiff did not receive the email to high-volume senders. (*Id*.)

Then-acting Attorney General Castor subsequently notified the recipients of the Gansler emails that he had in fact decided not to release the report at that time and extended the time period for individuals on the list to respond to the report before any release, because he was "acutely aware of the damage this information could do, however unwarranted, to many of your reputations." (*Id*. at ¶ 75.) On August 30, 2016, Bruce Beemer ("Beemer"), who had acted as First Deputy Attorney General from June 2014 to July 2016, was sworn into office as Attorney General. (*Id*. at ¶ 77.) Upon taking office, Beemer notified the media that while he had not yet seen Gansler's report, the individuals named in it must be afforded due process before their names could be publicly disclosed. (*Id*.) No such notice periods or procedural safeguards were used before Kane and the other Defendants, at Kane's direction, made their series of public comments and releases in 2014. (*Id*. at ¶ 76.)

On November 22, 2016, Beemer held a press conference to announce that he was releasing the Gansler report, which concluded that thirteen senior government officials, including five state judges, had sent inappropriate emails, as well as

thirty-eight high-volume senders of inappropriate emails. (*Id*. at ¶ 81.)[2] During the press conference, Beemer stated that he had ordered the names of all individuals who sent inappropriate emails redacted from the report, explaining that he disagreed "with the decision in September of 2014 to selectively name individuals when there were clearly a lot more than eight people involved." (*Id*. at ¶82.) Beemer further explained that he decided not to release individuals' names because many of the people named in the report were not employees of the Attorney General's office, it was not the Attorney General's obligation to act as a "moral arbiter" of email content, and that his "primary concern has to be the reputation of the individuals involved" because "it's very, very hard to unwring the bell if you're one of the people in the report, you're a pornographer, you're a misogynist, or you're a racist." (*Id*.)

## B.   **Procedural History**

Plaintiff initiated this action by filing a complaint on September 26, 2016. (Doc. 1.) In response to a motion to dismiss submitted by Defendants (Doc. 11), Plaintiff amended his complaint on December 12, 2016 (Doc. 14). Defendants responded with a motion to dismiss the amended complaint (Doc. 15), accompanied by a brief in support thereof (Doc. 16). Plaintiff filed a brief in opposition (Doc. 23), Defendants replied (Doc. 24), and Plaintiff filed a sur-reply

---

[2] Neither of those two groups of senders included any of the individuals Kane publicly identified in 2014, including Plaintiff. (*Id*.)

brief (Doc. 27). Thus, the motion to dismiss has been fully briefed and is ripe for disposition.

## II.  **Legal Standard**

Defendants have moved to dismiss the amended complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint against the pleading requirements of Rule 8(a), which requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). For a complaint to survive dismissal it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *United States v. Pennsylvania*, 110 F. Supp. 3d 544, 548 (M.D. Pa. 2015) (quoting *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012)); *see also* Fed. R. Civ. P. 12(b)(6).

## III.    Discussion

The amended complaint asserts claims pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's right to equal protection of the law under a class-of-one theory (Count I) and Plaintiff's right to procedural due process (Count II). Defendants have moved to dismiss both counts, arguing that: 1) class-of-one equal protection claims are not available in the public employment context; 2) a due process claim cannot be maintained based solely on reputational harm; and 3) even if the amended complaint sufficiently alleged claims in Counts I and II, Defendants are nonetheless entitled to qualified immunity from those claims. (*See* Doc. 21.) The court will address these arguments in turn.

### A.    Class-of-One Equal Protection Claim

In Count I of the amended complaint, Plaintiff alleges that his right to equal protection of the laws was violated by Defendants' release of his name in 2014 in relation to the inappropriate emails found on the OAG's email servers because Defendants did not release the names of hundreds of similarly-situated individuals. In order to state an equal protection claim pursuant to § 1983, a plaintiff typically must allege that he was treated differently than similarly-situated individuals by a state actor on the basis of his membership in an "identifiable group" or class. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). While membership in a protected class is normally required, the Supreme Court has also recognized that a

plaintiff may maintain an equal protection claim on the basis that he "has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Oregon*, 553 U.S. 591 (2008) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). To proceed on a class-of-one equal protection claim, a plaintiff must allege "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Bag of Holdings, LLC v. City of Phila.*, 682 F. App'x 94, 97 (3d Cir. 2017) (quoting *Olech*, 528 U.S. at 564). At the motion to dismiss stage, "[a]llegations of irrational and wholly arbitrary disparate treatment [are] sufficient, regardless of subjective motivation, to state a claim for relief." *Id.* (citing *Olech*, 528 U.S. at 565).

Here, Plaintiff has sufficiently alleged that Kane's disparate treatment of him and others perceived to be friends of Fina had no rational basis, and that the release of his name in connection with the inappropriate emails was done as both a means of retaliation against Fina and as a way to derail the criminal investigation into Kane. The names of hundreds of other individuals were not released, and Plaintiff was not in the group of high-volume senders included in the Gansler report. Based on these allegations, the court finds that Plaintiff has sufficiently stated a class-of-one equal protection claim. Defendants argue, however, that such a claim is precluded because "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist*, 553 U.S. at 597. Class-of-one equal

protection claims are not cognizable in the public employment context because the discretion of the government employer is "subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id*. at 604. Courts do not inquire into such discretionary decision making because "government offices could not function if every employment decision became a constitutional matter." *Reed v. Chambersburg Area Sch. Dist.*, 951 F. Supp. 2d 706, 716 (M.D. Pa. 2013) (quoting *Engquist*, 553 U.S. at 605). As the Supreme Court has explained, class-of-one claims in the public employment context create the potential that

> any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim. Indeed, an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action—not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments—on the theory that other employees were not treated wrongfully.

*Engquist*, 553 U.S. at 608.

Here, however, there is no basis upon which to frame Kane's release of Plaintiff's name in 2014 as in the public employment context. At the time of the release, Plaintiff was no longer employed at the Attorney General's Office. Kane therefore had no ability to hire, fire, or promote Plaintiff, nor could she have

affected his salary or work assignments. [3] Simply stated, it is difficult for the court to view an allegedly retaliatory act against a former employee, fueled by personal animus, as an employment decision. The court is also not persuaded by Defendants' argument that the 2014 release was somehow based on Kane's desire to manage the internal operations at the OAG by improving the email use of then-current OAG employees, because the amended complaint alleges that Kane did not release the names of then-current employees, and in fact litigated her right to protect their anonymity under the Pennsylvania Right-To-Know Law. Thus, the court finds that Kane's actions were not made in the public employment context, and the court will not dismiss Plaintiff's class-of-one equal protection claim on this basis.

### B.  Due Process Claim Based on Reputational Harm

Defendants next move to dismiss Count II of the amended complaint, which asserts that Plaintiff was deprived of procedural due process when Kane released his name and emails without a hearing, causing him reputational harm and loss of employment. Defendants contend that Plaintiff has failed to plead sufficient facts to support his due process claim. The court agrees.

---

[3] Although Plaintiff was still a public employee as a member of the Office of General Counsel, he was not employed by any of Defendants and they did not have the ability to make any decisions regarding his employment. Thus, for purposes of the *Engquist* decision, the analysis would be the same as if Plaintiff was employed by any third party employer, whether public or private.

It is well established that "reputation *alone* is not an interest protected by the Due Process Clause."[4] *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (quoting *Versarge v. Twp. of Clinton, N.J.*, 984 F.2d 1359, 1371 (3d Cir. 1993)). "Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest." *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Under this "stigma-plus" test in the public employment context, "[t]he creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.' When such a deprivation occurs, the employee is entitled to a name-clearing hearing." *Id.* "To satisfy the 'stigma' prong of the test, the employee must show: 1) publication of 2) a substantially and materially false statement that 3) infringed upon the 'reputation, honor, or integrity' of the employee." *Brown v. Montgomery Cty.*, 470 F. App'x 87, 91 (3d Cir. 2012) (quoting *Ersek v. Springfield*, 102 F.3d 79, 83-84 (3d Cir. 1996)).

Here, the amended complaint alleges that Defendants Kane and Martin published statements claiming that Plaintiff was a member of a "core group who sent and received a majority of the [inappropriate] emails," and that many of the

---

[4] Plaintiff argues that reputational harm alone does amount to a constitutional liberty interest under the Pennsylvania Constitution, and therefore the stigma-plus test does not apply. This argument, however, has been roundly rejected by other district courts within the Third Circuit. *See Koresko v. Solis*, Civ. No. 09-cv-3152, 2011 WL 5447435, *5 (E.D. Pa. Nov. 10, 2011) (collecting cases). This court joins the consensus and finds that Plaintiff must plead facts to meet the "stigma-plus" test in order to maintain his due process claim based upon harm to his reputation.

emails were "borderline" and "very close" to child pornography. (Doc. 17, ¶ 117.) According to the Gansler report, however, Plaintiff was not among the thirty-eight "high-volume senders" identified in the report. It is therefore plausible at this stage of the litigation that Kane and Martin's statements, taken in concert, were substantially and materially false, and the suggestion that Plaintiff was a high-volume sender of material verging on child pornography would certainly infringe upon his reputation, honor, and integrity. Thus, for purposes of the present motion, the court finds that Plaintiff has met his burden as to the stigma portion of the test. The court must now examine whether Plaintiff has also pleaded the required plus.

As stated above, the plus is the termination or constructive discharge from employment. *See Hill*, 455 F.3d at 238. Here, Plaintiff alleges that he was terminated from his employment at the Office of General Counsel after Kane released his name in conjunction with the email scandal. Defendants argue that this allegation fails the plus requirement because Defendants did not carry out the plus. Plaintiff contends that a third party termination can satisfy the plus element, and relies heavily on *Fouse v. Beaver Cty.*, 14-cv-0810, 2015 WL 1967242, *8 (W.D. Pa. May 1, 2015). In *Fouse*, the plaintiff brought a stigma-plus claim against his former supervisor who had made allegedly defamatory statements against him, causing him to lose his secondary employment. However, the *Fouse* court made clear that the loss of the secondary employment supported the stigma prong, not

the plus prong. *See id*. at \*7 n.14. An almost identical argument was recently rejected in *Bassetti v. Boyertown Area Sch. Dist.*, Civ. No. 17-cv-1137, 2017 WL 3480977, \*6 (E.D. Pa. Aug. 14, 2017), in which the court stated that "the Third Circuit's definition of a stigma-plus claim in *Hill v. Borough of Kutztown*, combined with the underlying facts of that case, can be read to imply that the actions constituting the stigma and the plus must both be performed by the defendant-employer." *Id*. Further, while the *Bassetti* Court had not identified "any authority indicating that a plaintiff may bring a stigma-plus claim against a party that did not actually carry out the termination, i.e. the plus[,] . . . at least one other district court within the Third Circuit has concluded that third party terminations cannot satisfy the plus element." *Id*. (citing *Grimm v. City of Uniontown*, Civ. No. 06-cv-1050, 2008 WL 282344, \*30 (W.D. Pa. Jan. 31, 2008)) ("Defendants in this case were not in a position to take any adverse employment action against Plaintiff because they did not employ him and the entity that did . . . is not named as a defendant in this case."). This court agrees with the holding in *Bassetti* and finds that Plaintiff cannot maintain his stigma-plus claims against Defendants because they did not terminate him from his employment. Accordingly, Count II of the amended complaint will be dismissed with prejudice.[5]

---

[5] Additionally, the court finds that amendment would be futile because Plaintiff cannot allege that Defendants in fact terminated him from his third party employment, as would be required under the law.

## C.    Qualified Immunity

Defendants' final argument is that even if Plaintiff has stated a class-of-one equal protection claim, Defendants are nonetheless entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014) (quoting *Reichle v. Howards*, 556 U.S. 658, 664 (2012)). In determining whether to grant qualified immunity, the court must determine (1) if the plaintiff has alleged sufficient facts to make out a violation of a constitutional right and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [person] that his conduct was unlawful in the situation he confronted." *Id*. at 202. As stated above, the court has found that Plaintiff has pleaded sufficient facts to support a class-of-one equal protection claim. Thus, the court must turn to whether Plaintiff's right to equal protection was clearly established.

Defendants contend that the contours of the public employment context in which the decision in *Engquist* would bar class-of-one claims was not clearly established at the time of Kane's release of emails in 2014. However, as the court stated above, nothing from the *Engquist* decision, or any subsequent case law

20

interpreting it of which the court is aware, has expanded the public employment context beyond employment decisions or actions that occurred while a plaintiff was a public employee of named defendants. The *Engquist* decision was made in 2008, a full six years before Kane's allegedly unconstitutional actions. Thus, the court finds that Plaintiff's right to equal protection of the law and ability to bring a class-of-one claim was clearly established at the time that Kane released his name, but not the names of others who were similarly situated, in connection with the inappropriate emails, and Defendants are therefore not entitled to qualified immunity.

## IV.   **Conclusion**

For the reasons stated herein, the court finds that Plaintiff has pleaded sufficient facts to state his class-of-one equal protection claim contained in Count I of the amended complaint and that Defendants are not entitled to qualified immunity. Accordingly, Count I will not be dismissed. However, the court finds that Plaintiff has failed to plead sufficient facts to support a "stigma-plus" procedural due process claim, and, thus, Count II will be dismissed.

An appropriate order will issue.

 s/Sylvia H. Rambo
 SYLVIA H. RAMBO
 United States District Judge

Dated: November 9, 2017