IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GLENN A. PARNO,** | : | No. 1:16-CV-01949 |
| Plaintiff, | : | |
| v. | : | |
| **KATHLEEN KANE et al.,** | : | |
| Defendants. | : | Judge Sylvia H. Rambo |

# MEMORANDUM

Before the court are the parties' cross motions for summary judgment. (Docs. 92, 101.) For the reasons set forth below, Defendants' motion will be granted in part and Plaintiff's motion will be denied.

## I.  BACKGROUND

This case arises from Plaintiff Glenn A. Parno's claim that former Pennsylvania Attorney General Defendant Kathleen Kane, along with certain members of her staff, violated his equal protection rights by publicly identifying him as one of a handful of former employees of the Office of Attorney General ("OAG") who sent and receive inappropriate emails using his work account.

Shortly after becoming Pennsylvania Attorney General in January 2013, Kane hired Geoffrey Moulton as a Special Deputy Attorney General to review the office's prior sexual assault investigation of Jerry Sandusky. (Doc. 92-3 ¶ 14; Doc. 108-1 ¶ 33.) The Sandusky investigation had been led by former Chief Deputy Attorney

1

General Frank Fina, and Kane brought Moulton in to determine whether political factors had impacted the investigation. (Doc. 92-3 ¶ 17.) Moulton utilized a number of personnel within the OAG to assist with the review, including Defendant David Peifer, head of the OAG's Bureau of Special Investigations, and Defendant Braden Cook, a supervisory Special Agent who worked under Peifer in the computer forensics section. (*Id.* ¶¶ 18, 19.)

In the course of their review, Moulton's team discovered that the office's email server did not contain any OAG emails from the period of the Sandusky investigation. (*Id.* ¶ 23.) As a result, between October 2013 and March 2014, Cook worked to restore more than 21 million deleted emails. (*Id.* ¶¶ 24–25.) Upon searching and reviewing the emails for evidence that might bear on decisions made during the Sandusky investigation, Cook discovered some emails contained pornography and other offensive content, which violated the OAG's policy prohibiting the use of government computers to send or receive pornographic, racist, sexist or similarly offensive material. (*Id.* ¶¶ 7–8, 26, 29.) He went on to alert Peifer to the materials in Spring 2014. (*Id.* ¶ 30.)

On March 16, 2014, the *Philadelphia Inquirer* published a negative article about Kane shutting down an investigation of certain Democratic politicians. (Doc. 108-1 ¶¶ 29–30.) Kane was upset about the article and regarded it as an attack on her and the OAG's integrity. (*See id.* ¶¶ 31–32; Doc. 104-1 pp. 25–26, 67; Doc. 104-

5 p. 21.) She suspected the story was leaked by Fina, who had previously led that investigation too, and she regarded it as retaliation for opening a review into Fina's handling of the Sandusky investigation. (Doc. 108-1 ¶ 32.) On the day the story was published, Kane sent an email from her private account to her public relations consultant, which read in part, "I will not allow them to discredit me or our office [. . .] This is war." (Doc. 104-5 p. 42.)

Following her declaration of war, around April or May 2014, Kane orchestrated a leak of confidential grand jury information regarding a prior investigation into a former head of the Philadelphia NAACP, whom Fina had declined to prosecute. (Doc. 108-1 ¶ 35.) *Commonwealth v. Kane*, 188 A.3d 1217, 1223 (Pa. Super. 2018). She was eventually charged and found guilty of multiple offenses in connection with the leak. *Id.*

In July 2014, the OAG began receiving records requests under Pennsylvania's Right-to-Know Law ("RTKL") for certain of the inappropriate emails. (*See* Doc. 108-1 ¶ 85.) The RTKL submissions came from multiple media outlets and varied in detail, though most included a list of specific individuals whose communications were sought. (Doc. 92-5 pp. 148–77.) By late September 2014, the OAG had received RTKL requests from at least seven different news organizations. (*See id.*; Doc. 104-13 pp. 34–52.) The submissions collectively requested the emails of sixteen unique individuals, including Parno, who had previously worked in the OAG

3

as a supervisor for environmental cases, as well as Fina. (*See* Doc. 92-3 ¶ 68(vii); Doc. 92-5 pp. 148–177; Doc. 104-7 p. 93; Doc. 108-1 ¶ 85.)

RTKL officers tasked Cook with identifying and collecting emails that were responsive to the requests. (*See* Doc. 92-3 ¶ 42; Doc. 92-5 pp. 28, 30, 72, 73.) When asked to collect a particular person's emails, Cook would review the communications on his own computer and save any inappropriate materials to a folder under that person's name. (Doc. 92-5 p. 72.)

Between September 19 and September 24, 2014, the OAG's RTKL officers denied the various media requests on grounds that the inappropriate emails did not constitute public records under the RTKL, and that they fell within the law's non-criminal investigative exception to disclosure. (Doc. 108-1 ¶¶ 156–57.)

Nevertheless, on September 25, 2014, at Kane's direction, the OAG publicly released inappropriate emails from the accounts of eight individuals listed in the RTKL requests, including Parno. (Doc. 92-3 ¶ 73; Doc. 108-1 ¶¶ 92, 166–67.) The release took place in a conference room at the OAG and consisted of Cook visually displaying the inappropriate materials to members of the media, and verbally identifying who among the group of eight was responsible for each piece of material. (Doc. 108-1 ¶ 181.) Peifer and Defendant William Nemetz, a Special Agent with the OAG, worked security at the event. (Doc. 92-3 ¶ 100; Doc. 108-1 ¶ 168.)

In addition, Defendant Renee Martin, acting Director of Communications for the Attorney General, issued a statement from Kane, explaining that the office could not respond to all aspects of the RTKL requests, but that certain disclosures could nevertheless be made. (Doc. 92-3 ¶ 74; Doc. 108-1 ¶ 192.) The statement also expressed Kane's belief that it was in the public interest to understand how public servants conduct business, and that transparency on the matter would help to discourage others from exchanging inappropriate materials on state-owned computers. (Doc. 108-1 ¶ 192.)

By releasing information related to only eight of the individuals named in the RTKL requests, each of whom were former OAG employees, Kane withheld the identities and responsive communications of four people.[1] Two were current employees, with Kane's press release stating, "Per your request, where possible, the disclosure shows the individual who sent and received the emails in question. However, consistent with our human resource policies and current union agreements, we have redacted the names of current employees." (Doc. 108-1 ¶ 192.) The others were Fina and a second former OAG prosecutor, who were protected by a court order, as alluded to in the press release: "Also, there are restrictions—upon

---

[1] Four other individuals listed in the RTKL requests did not send or receive inappropriate emails, so no responsive documents existed. (*See* Doc. 92-3 ¶ 64.) These tallies disregard an additional unique individual whose emails were specifically requested but not released at the September 25 press conference. That request was not received by the OAG until just before the press conference, and Cook testified that he did not have time to review the individual's email account for responsive communications prior to the release. (*See* Doc 116 ¶ 90; Doc. 114-1 pp. 25–27.)

which we cannot elaborate—which currently prohibit us from revealing the names of some other people who participated in this activity. So, for now, those names have been redacted." (*Id*. ¶ 192.)

On September 26, 2016, Parno initiated this action by filing a complaint, which he subsequently amended, asserting claims for violations of the Equal Protection Clause against Kane, Nemetz, Peifer, Cook, and Martin.[2] (Docs. 1, 17.) The amended complaint alleges that Defendants' treatment of Parno violated the Equal Protection Clause, under a "class-of-one" theory, by releasing his identity and inappropriate emails to the public, since hundreds of other current and former OAG employees engaged in substantially the same conduct as Parno but did not have their names and communications released. (Doc. 17 ¶¶ 88-91.) According to the amended complaint, the decision to release Parno's emails was divorced from any legitimate government purpose and instead motivated by Kane's animus toward Fina and those close to him. (*See id.* ¶¶ 91–97.)

The parties have filed cross motions for summary judgment. (Docs. 92, 101.) The motions have been fully briefed and are ripe for review.

---

[2] The amended complaint also asserts procedural due process claims, which have since been dismissed. (*See* Doc. 34.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law and is "genuine" only if there is a sufficient evidentiary basis for a reasonable factfinder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers

to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

### III.  DISCUSSION

Defendants' motion for summary judgment argues that (1) Parno cannot show unequal treatment by Nemetz, Peifer, Cook, or Martin because they were not involved in the decision to release his emails; and (2) Parno cannot show class-of-one liability against Kane because she did not treat him differently than anyone else similarly situated, and since any difference in treatment that did exist was supported by a rational basis.

Parno's motion for summary judgment contends that (1) the evidence establishes Parno received unequal treatment as compared to other people who appeared on the same emails and engaged in the same conduct but did not have their

identities released; (2) no rational justification existed for Parno's unequal treatment; and (3) the only reasonably conceivable explanation for Parno's treatment was his connection to Fina.

"To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003). Persons are "similarly situated" where they are alike "in all relevant aspects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Similarly situated, however, "does not mean identically situated." *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (internal citations and quotations marks omitted). Rather than demanding "exact correlation" between persons, courts look to whether there is "relevant similarity." *Id.*

Establishing different treatment "in particular imposes a high burden," and requires the plaintiff to show that the differing treatment "'is irrational and wholly arbitrary.'" *Highway Materials, Inc. v. Whitemarsh Twp.*, 386 F. App'x 251, 259 (3d Cir. 2010) (quoting *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004) (brackets omitted)); *see Eichenlaub*, 385 F.3d at 286 ("The Supreme Court has held that a 'class of one' can attack intentionally different treatment if it is 'irrational and wholly arbitrary.'") (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

### A. <u>Nemetz, Peifer, Cook, and Martin are entitled to summary judgment.</u>

As an initial matter, Defendants' motion demonstrates that Nemetz, Peifer, Cook, and Martin are entitled to summary judgment because there is no material dispute that they were not involved in the decision to release Parno's emails. (*See* Doc. 92-3 ¶¶ 90-92; Doc. 108 ¶ 92) ("It is admitted that Kane was the one who made the decision to release the names and emails/attachments of the group of eight.") Nemetz's only involvement was working security at the September 25 press conference. (Doc. 92-3 ¶¶ 100–02; Doc. 104-1 p. 23.) Peifer also attended the press conference to provide security, as well as ensure that Cook did not answer questions from the media. (Doc. 104-1 pp. 23, 77, 78.) Other than that, the closest Peifer came to the matter was providing an RTKL officer with inappropriate communications that had been collected as part of the Sandusky review. (*Id*. p. 78.) Nementz's and Peifer's mere presence in the room at the time of the release and Peifer's handling of documents came in the discharge of their ordinary responsibilities and did not call on them to exercise any true discretion in the matter. Neither individual bore any responsibility for treating Parno unequally.

Cook and Martin were decidedly closer to the release of Parno's emails, but they too lacked responsibility for Kane's decision. Cook searched the email accounts of Parno and others (*see* Doc. 92-3 ¶¶ 42–44) and contributed to the publication of the materials by redacting and presenting them to reporters and compiling hard

copies. (Doc. 108-1 ¶¶ 169–70, 194, 196.) Martin similarly helped coordinate the release, including by contacting the press, preparing materials for publication, and crafting public statements on Kane's behalf. (*Id.* ¶¶ 8, 143, 170, 192–96; Doc. 92-3 ¶¶ 74–75, 94.) Despite their proximity to the facts of this case, however, the record is clear that Cook and Martin played no part in the decision to release the emails and that they carried out their tasks under instructions from more senior officials. (*See* Doc. 92-3 ¶¶ 42–43, 74; Doc. 108-1 ¶¶ 166–68.) Moreover, Cook's work searching for and selecting inappropriate emails did not require meaningful discretion, particularly considering that he was directed on which accounts to search and whose emails to display to the press. (*See* Doc. 92-5 pp. 40–42, 65, 69, 72–73.) *Cf. Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I know it when I see it[.]"). And any discretion exercised by Martin was limited to the selection of language for press releases and thereby divorced from the particular unequal treatment about which Parno complains. (*See* Doc. 108 ¶ 92; Doc. 108-1 ¶¶ 8, 143, 192.)

The Equal Protection Clause protects against arbitrary decisions by "governmental decisionmakers," and it is undisputed that the individual defendants, other than Kane, played no role in the government decision challenged by Parno. *See Nordlinger*, 505 U.S. at 10 ("The Equal Protection Clause . . . simply keeps governmental decisionmakers from treating differently persons who are in all

11

relevant respects alike."); *Mun. Revenue Servs., Inc. v. McBlain*, 347 F. App'x 817, 825–26 (3d Cir. 2009) (defendant's approval of agreement between municipality and plaintiff's business competitor was not unequal treatment where he was only tangentially involved in approving the transaction and there was no evidence that he personally supported the agreement or "took any action, beyond what was required of him as solicitor of Delaware County to advance the transaction") (internal citation omitted). Nemetz, Peifer, Cook, and Martin are therefore entitled to summary judgment.

### B. **Kane is not entitled to summary judgment.**

In contrast to the other individual defendants, Kane is not entitled to summary judgment. With respect to the first element of a class-of-one claim, and viewing the facts in a light most favorable to the non-moving party, a reasonable jury could find that Kane treated Parno differently than at least two similarly situated individuals. Setting aside two individuals that were indisputably protected by a court order, Parno was one of ten people who exchanged inappropriate materials and whose communications were specifically requested by the media. Yet Kane released the emails of only eight individuals, each of whom were former OAG employees, while she held back the emails of two current employees.

Though Kane submits she had a valid reason for holding back the current employee emails—she thought they were protected under OAG policy—that fact

remains sharply disputed, and ample evidence exists from which a jury could find that Kane's decision was actually driven by personal or political concerns. (*See infra*.) More significantly, Kane's reason for holding back the emails of two current employees goes to the second element of Parno's class-of-one claim—whether a rational basis existed for treating Parno differently. All that is important for purposes of the "similarity situated" inquiry is that, at the time of the release, Kane knew about and had access to the inappropriate emails of at least two additional people, both of whom were also the subject of media interest, and both of whom purportedly engaged in substantially the same behavior as Parno. Drawing all inferences in his favor, a reasonable jury could find that Parno was treated differently than at least two other similarly situated individuals.

On the issue of whether the release was arbitrary and irrational, Kane submits that Parno cannot demonstrate she lacked a rational basis for releasing the emails since the media had requested them, and because disclosing improper behavior by public officials is always in the government's interest. According to Kane, the evidence merely shows that she had an axe to grind with Fina, a non-party to this action, and that she failed to comply with the particular notice procedures of the RTKL, neither of which negate every potential justification for the release as a matter of law.

But viewing the facts in a light most favorable to Parno, three main categories of evidence exist that would permit a reasonable factfinder to conclude that Kane's decision was irrational and wholly arbitrary. First, and most fundamentally, Kane's given reason for withholding the emails of the two current employees—she believed they were protected by OAG human resources policies and/or the office's collective bargaining obligations—contains relatively thin support in the record. Kane primarily relies on her own deposition testimony, in which she clearly remembered discussions with only one particular individual, Adrian King, who for his part denied recalling such conversations. Kane's stated reason for her decision is further called into question by contradictory statements she made after the release, in which she urged the judiciary to authorize publication of inappropriate materials by current employees. (*See* Doc. 108-1 ¶¶ 236–43; *see also id.* ¶¶ 160–62, 193.) A jury could comfortably disbelieve and negate Kane's professed justification for the release.

Second, numerous pieces of evidence suggest that Kane's ultimate decision to release the emails may have been driven by her vendetta against Fina, a former close colleague of Parno. The record is clear that Kane wanted to release Fina's inappropriate emails to inflict harm or affect his behavior, but that she was unable to do so at the time due to a court order protecting him. Moreover, Kane and her advisors viewed her "war" against not only Fina, but also unnamed individuals close to him (*see id.* ¶¶ 34, 123), and Parno and the other members of the group of eight

were known to be associates of Fina. (*Id*. ¶¶ 23–27.) One member of the group was even ordered by Kane's advisor, "tell your boy [Fina] to back off." (*Id*. ¶ 120.) A jury finding that Kane's decision was designed to indirectly harm Fina would provide substantial support for Parno's theory of the case and largely satisfy his burden of demonstrating that the release was arbitrary and wholly irrational. *See Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005) (finding sufficient evidence of unequal treatment to preclude summary judgment where the plaintiff was "arguably" targeted due to its support for a political faction on the local village council).

Third, the record indicates that Kane's approach to the RTKL requests was irregular from its inception. Kane appeared to wall-off her OAG deputies and RTKL officers from the process of deciding whether to release the emails. (Doc. 108-1 ¶¶ 165, 189–91.) Her close confidants and political advisors were looped in more regularly, and a member of her protective detail even turned heads by joining in the search for inappropriate emails. (*See id*. ¶¶ 51–61, 132, 165.) Kane also released the emails over the objections of her senior leadership team, and without providing the group of eight the type of advanced notice required by the RTKL. (*Id*. ¶¶ 95, 111, 133, 185–86, 189–91, 200.) Kane's sidestepping of common office practice and formal statutory notice requirements reinforces doubts about her stated reasons for

releasing the emails of some but not others, providing additional support that her treatment of Parno was arbitrary.

These categories of evidence, considered together, would permit a jury to conclude that Kane's decision to release Parno's emails was not supported by a legitimate government interest. Her motion for summary judgment will therefore be denied.

### C. **Parno is not entitled to summary judgment.**

Parno is also not entitled to summary judgment on his class-of-one claim, because assuming he can show that similarly situated individuals did not have their identities and communications released by Kane, fact issues preclude finding that the release of his identity and emails was wholly arbitrary and irrational. As described above, numerous categories of circumstantial evidence suggest that Parno's treatment may have been driven by Kane's personal and political feud with Fina. But Kane's intentions toward Fina, considered together with the professional relationship between Fina and Parno and the unorthodox manner in which Kane carried out the release, do not necessarily foreclose a jury finding that her actions were supported by a legitimate government objective. As Kane's brief points out, the disclosure of improper behavior by public officials is inherently righteous and serves the public interest, and at the time of the release, Parno was among a select

16

group of individuals who both engaged in the exchange of inappropriate materials and whose emails had been specifically requested by the media in RTKL requests.

Parno's circumstantial evidence, which is admittedly sizeable in quantity, must nevertheless be weighed against the OAG's public statements at the time of release, as well as Kane's subsequent, consistent deposition testimony on the matter. Both accounts support that Kane believed disclosure served the public interest, and that the release of current employee emails would violate the office's human resources policies and collective bargaining obligations. While Parno's motion argues that Kane's testimony on the matter is vague, she did provide some specifics as to how she came to conclude that it was unwise to release the communications of current employees, including that the relevant discussions involved Adrian King, the OAG's Public Protection Division, and potentially Nicole Kreiser, the head of human resources. (*See* Doc. 92-5 pp. 20, 23, 24.) Kane's version of the events is hardly confirmed by the broader record, but nor is it squarely contradicted: King testified that he may have participated in conversations about whose emails to release, and neither party's submissions shed meaningful light on the roles played by the Public Protection Division or Nicole Kreiser in releasing the emails.

The record provides strong reason to question Kane's proffered basis for her decision, but viewed in a light most favorable to Kane, and against the backdrop of the "particular[ly] . . . high burden" required to prevail on a class-of-one claim, his

17

evidentiary showing stops short of demonstrating, as a matter of law, that Kane had no rational basis for her decision. *Highway Materials, Inc.*, 386 F. App'x at 259; *see Patterson v. Strippoli*, 639 F. App'x 137, 144–45 (3d Cir. 2016) (noting the "high hurdle for plaintiffs" under the rational basis standard for a class-of-one claim). As such, Parno's request for summary judgment will be denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment will be granted as to Nemetz, Peifer, Cook, and Martin and denied as to Kane, and Plaintiff's motion for summary judgment will be denied. An appropriate order shall follow.

Dated: February 3, 2023.

> */s/ Sylvia H. Rambo*
> SYLVIA H. RAMBO
> United States District Judge